**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FT. MYERS DIVISION**

JACQUELINE J. STRAIN,

                    **Plaintiff,**

v.                                  **Case No.  2:09-CV-320-FtM-UA-DNF**

MICHAEL J. ASTRUE,
**Commissioner of Social Security,**

                    **Defendant.**

_____/

## <u>OPINION AND ORDER</u>[1]

This matter is before the Court on Plaintiff's complaint (Doc. #1), seeking review of the

final decision of the Commissioner of Social Security of the Social Security Administration (the

Commissioner) denying her claim for disability and disability insurance benefits (DIB) pursuant to

42 U.S.C. § 405(g).  The Commissioner has filed the Transcript of the proceedings (hereinafter

referred to as "Tr." followed by the appropriate page number), and the parties have filed legal

memoranda.  For the reasons set forth below,  the  Court  finds that the Commissioner's decision

is due to be **REVERSED AND REMANDED.**.

I.       **SOCIAL SECURITY ACT ELIGIBILITY, THE ALJ'S DECISION**
           **AND STANDARD OF REVIEW**

A plaintiff is entitled to disability benefits when she is unable to engage in substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

---

[1]    Both parties have consented to the exercise of jurisdiction by a magistrate
judge, and the case has been referred to the undersigned by  an Order of
Reference dated 9/2/2008. (Doc. 15) and reassigned to Magistrate Judge
Douglas N. Frazier per (Doc. 14) consent.

be expected to either result in death or last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423 (d) (1)(A); 1382c(a)(3)(A). The Commissioner has established a five-step sequential evaluation process for determining whether a plaintiff is disabled and therefore entitled to benefits. *See* 20 C.F.R. § 416.920(a)-(f); *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). The plaintiff bears the burden of persuasion through Step 4, while at Step 5 the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

On February 15, 2004, the Plaintiff filed an application for disability and disability insurance benefits alleging an onset date of August 20, 2003. [Tr. 93-95]. A video hearing was held before Administrative Law Judge ("ALJ") Dolores McNerney, who presided from Philadelphia, Pennsylvania, on March 3, 2006. The Plaintiff appeared and testified from Fort Myers, Florida. Present in Philadelphia and also testifying was Gary A. Young, a vocational expert.. [Tr. 37-42, 44-47, 489-530]. In her decision dated June 19, 2006, the ALJ denied benefits, finding the Plaintiff not disabled. [Tr. 24-33]. The Plaintiff filed a request for review of the hearing decision and on April 16, 2008, the Appeals Council denied the request for review. [Tr. 4-8]. The ALJ's decision became the final decision of the Commissioner. This decision is now ripe for review under the Social Security Act, 42 U.S.C. § 405(g).

The Decision of Administrative Law Judge dated June 19, 2006, denied the Plaintiff's claims for disability or disability insurance benefits. At Step 1 the ALJ found the Plaintiff had not engaged in substantial gainful activity since August 20, 2003, her alleged disability date. At Step 2 the ALJ found that the Plaintiff has the following severe impairments: cervical spine disc disease and lumbar spine disc disease with superimposed strain/sprain associated with chronic neck and back pain, secondary to two motor vehicle accidents; and history/residuals of recurrent lower

extremity cellulitis.  The ALJ found that the Plaintiff has the residual functional capacity to perform light or sedentary work activity.  [Tr. 27].  At Step 3 the ALJ found the Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526).  At Step 4 the ALJ determined the Plaintiff was unable to perform her past relevant work as a nurse's helper. [Tr. 31].  At Step 5  the ALJ considered the Plaintiff's age (34 years old at the time of the hearing, which is defined as a younger person) and education.[2] .  Therefore, considering the Plaintiff's age, education, work experience, and residual functional capacity, the ALJ determined that there are jobs that exist in significant numbers in the national economy that the Plaintiff can perform.  [Tr. 21]

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

---

[2]     The issue of transferability of work skills is not material to this decision due to the Plaintiff's age. [20 C.F.R. 404.1568]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

## II.     REVIEW OF FACTS AND CONCLUSIONS OF LAW

### A.     BACKGROUND FACTS:

The Plaintiff was born on August 12, 1971, and was 34 years old at the time of the ALJ's decision. [Tr. 33, 93]. The Plaintiff is a high school graduate with LPN training. The Plaintiff has past relevant work experience as a cashier and food preparer in restaurants, as a grocery courtesy clerk and has worked as a certified nurse's assistant in nursing homes and health care agencies. [Tr. 102, 123-138]. The Plaintiff's earning record confirms she is insured for benefits through March 2009. [Tr. 85-92]. The Plaintiff was involved in two separate motor vehicle accidents. The first accident was on August 30, 2003, and the second motor vehicle accident was on March 26, 2004.

The Plaintiff alleges disability beginning on August 20, 2003, (MVA) due to disco genic back pain in the lumbar spine, cervical sprain/strain and herniated nucleus purposes in the lumbar spine at the L2-3 and L5-S1 [Tr. 108]. The ALJ found that the Plaintiff had the residual

functional capacity (RFC) to perform a wide range of light or sedentary work activity "[which precludes performance of her past relevant work but allows for work in jobs that provide for a sit/stand option, at will, with no more than occasional performance of postural activities, such as a packer, inspector, cashier, or assembler." [Tr. 21-33].

The Plaintiff was treated by Dr. Reagan from July 2001 through February 2004. [Tr. 172-221, 359-373]. The Plaintiff's medical records prior to her disability onset date show that the Plaintiff was seen at Morton Plant Meade Health Care on September 8, 2000, for pain and redness due to insect bites on her right thigh. Dr. Reagan diagnosed Erythema Nodosum[3] which was verified in a laboratory report dated July 12, 2001 and in his office notes. [Tr. 199, 205]. A chest x-ray revealed "mild tilting of the dorsal spine to the right." [Tr. 171]. Over this time period, Dr. Reagan regularly saw the Plaintiff for her various symptoms related to Erythema Nodosum, Cat Scratch Fever and Celluloids. [Tr. 176-198].

The Plaintiff began experiencing soreness in her lymph nodes and she was hospitalized from September 16-19, 2002. The record show the Plaintiff had right leg Celluloids with pain, tenderness, general fatigue, low back pain and erythema. [Tr. 222-234]. The Plaintiff was treated by Dr. Reagan, who noted, "[Over the last 1 year, she has had similar episodes," and the Plaintiff was treated with Vancomycin given intravenously. [Tr. 223, 224]. On October 14, 2002, the Plaintiff was treated by Dr. Rajani, "for urgent visit" due to swelling in her arms and legs and "severe oropharyngeal discomfort," with myalgias and nausea. [Tr. 208].

---

[3]  Erythema Nodosum is an inflammatory disease of the deep dermis and subcutaneous fat characterized by tender red nodules.

The Plaintiff was hospitalized again from May 29-30, 2003 for recurrent group B streptococcal cellulitis, lymphangitis, and lymphadenitis involving the left groin area, associated with fever. [Tr. 207, 279-284]. In June, Dr. Rajani sent the Plaintiff for a Doppler Echocardiogram, which suggested "mild mitral regurgitation and minimal tricuspid regurgitation, " with a possible "bicuspid." [Tr. 168, 169].

The Plaintiff was seen by Dr. Staci L. Price, D.C., P.A., for chiropractic modalities from August 2003 through February 2004. [Tr. 235-278]. In December of 2003, the Plaintiff complained of pain with exacerbations and waxing/waning of symptoms. [Tr. 242-268]. By January 12, 2004, Dr. Price concluded that the Plaintiff had reached Maximum Medical Improvement ("MMI"] for the injuries she had sustained in the August 20, 2003, MVA. DIAGNOSIS: "[1]. Compression fracture of C6-C7 superior end plates (confirmed by MRI). 2. C4-5, C5-6 and L5-S1 disc herniations (confirmed by MRI). 3. Cervical acceleration/deceleration myofascial sprain/strain injury resulting in cervical radculopathy. 4. Thoracic acceleration/deceleration myofascial sprain/strain injury resulting in mid-back pain. 5. Lumbar acceleration/deceleration myofascial sprain/strain injury resulting in low back pain and radiculopathy. 6. Post-traumatic headaches." Dr. Price concluded in her letter to the Plaintiff's attorney the following: "[A]lthough Ms. Strain has reached MMI as stated previously, these injuries are of a permanent nature and the patient can expect periods of aggravation and exacerbations directly proportional to the patient's level of activity. I recommend continuing treatment to control the symptoms association with this permanency." [Tr. 278].

Dr. Price referred the Plaintiff to Gray Muskovitz, M.D. for an orthopedic consultation. [Tr. 327-329]. The Plaintiff was seen by Dr. Muskovitz initially on September 24, 2003. The Plaintiff had decreased range of motion of the cervical spine, paracervical pain and tenderness, brachial plexus tenderness, and decrease in left thumb abduction strength. [Tr. 329]. The MRI findings showed loss of cervical lordosis; left sided cervical disc herniation; and L4-5 facet joint hypertrophy with L4-5 spinal stenosis. Dr. Muskovitz discussed conservative care versus surgery with the Plaintiff. Dr. Muskovitz warned "[t]hat she is at increased risk for post-operative morbidity and mortality due to her chronic underlying infection and possible immuno-compromised status." In October 2003, Dr. Muskovitz concluded that the Plaintiff should continue with Dr. Price because "[i]t would be too risky to proceed with operative intervention on the C-spine, since there is significant chance that she may develop post-operative infection ...in which case she will probably have a catastrophic event." [Tr. 327].

The Plaintiff was seen by Dr. Jairo D. Libreros-Cupido, M.D., a neurologist, in September, October and November of 2003. [Tr. 298-323]. Dr. Libreros provided the Plaintiff with her lumbar epidural injections. On December 15, 2003, the doctor, in his final report diagnosed lumbo-sacral sprain/strain with bilateral lumbar radiculopathy; cervical spine stain/sprain with bilateral cervical radiculopathy; and post-traumatic headaches post concussion syndrome. [Tr. 299]. Dr. Libreros concluded the Plaintiff had reached MMI with a 20% whole body impairment. He recommended that the Plaintiff avoid "lifting more than 20 pounds, repetitive flexion or extension of spine," which precluded her work as a health aide. [Tr. 299, 300].

On December 4, 2003, Paul Zak, M.D., an orthopedic surgeon, provided a second surgical opinion. Dr. Zak found the Plaintiff to be a candidate for cervical surgery at C4-5 and C5-6 and lumbar surgery at L5/S1 but advised that she "is very high for post-op infection including possible osteomyelitis," and so advised she continue with low impact exercise and chiropractic care. [Tr. 326].

Dr. Rajani referred the Plaintiff to Robert Volbracht, M.D., neurologist in March, July and August of 2004. [Tr. 300-334]. Dr. Volbracht notes contain a list of the various physicians the Plaintiff had seen and her symptoms of weight gain (10 pounds), fatigue, sleep difficulty, dizziness, fainting, neck and back pain, headaches, swollen glands, periodic fevers and swollen lymph nodes under the arms and legs. [Tr. 330, 331]. The Plaintiff's medications consisted of Hydrocodone, Naprosyn, Amoxicillin and Ibuprofen. [Tr. 330].

Dr. Volbracht found upon examination areas of spasm -left trapezius muscle, tenderness over the occipital nerves, limitation of neck motion and limitation of low back on forward flexion and extension. [Tr. 331]. DIAGNOSIS: "[C]ervical strain, thoracic strain, lumbar strain, post-traumatic headaches, bilateral occipital neuralgia, and history of cat scratch fever." Dr. Volbracht administered injections into the occipital nerves, trigger ponds along the cervical paraspinals and the left trapezius muscle. The Plaintiff was advised to begin of course of physical therapy and stretching exercises. [Tr. 331-343].

In August of 2004, the Plaintiff was seen by Dr. Volbracht and indicated her condition was getting worse due to another motor vehicle accident. She was experiencing increased anxiety, "dizziness on and off;" difficulty doing housework, and difficulty lifting a gallon of milk and

repetitive activities." [Tr. 333]. Dr. Volbracht's opinion: "[S]he does have some self-limited activities as far as being afraid to lift anything because it hurts," and, "[I]t is unlikely she is capable of sustained activities for a work setting of eight hours a day."

The Plaintiff was seen by Dr. Bindu A. Thomas from January 2005 through February 2006. Dr. Thomas' records show the Plaintiff's treatment for chronic pain and hypertension. On May 3, 2005, the Plaintiff suffered from plantar fascitis requiring rest, icing, and stretching. Further, that she needed pain management. [Tr. 353-358, 380, 399). On February 16, 2006, Dr. Thomas diagnosed: hypertension, anemia, and chronic neck/back pain "not better." [Tr. 380]. Further, in a letter dated that same date (2/16/06), "To Whom It May Concern", Dr. Thomas noted that the Plaintiff had been a patient since July of 2001. That her medical history considered of lymphadenitis and cellulitis, with a chronic group B strep infection, deep vein thrombosis and chronic neck and back pain due to the MVA in August of 2003. On December 6, 2007, Dr. Thomas completed a Physical Medical Assessment Questionnaire. Dr. Thomas wrote that she had last seen the Plaintiff on November 15, 2007, and opined that the Plaintiff could not even handle the demands of sedentary work. [Tr. 374-379].

The Plaintiff was seen at Citrus Memorial Hospital on September 12, 2006, for a non-contrasted magnetic resonance scan ( MRI) of the lumbar spine. IMPRESSION: "[1]. Moderate midline posterior extension of disc intensity material at L5/S1 without compression of the thecal sac. 2. Old appearing disc protrusion posteriorly with end plate irregularities, consistent with injury and accelerated degenerative changes at L2/3. " [Tr. 447-448]..

The Plaintiff was seen by Dr. Eihab H. Tawfik, on January 24, 2007. The Plaintiff had a "Strep B infection, " with lymphadenopathy. Dr. Tawfik listed the Plaintiff's complaints of back pain; lumbar radiculopathy; hypertension, depressive disorder; UNS osteomyelitis site UNS;" cervical spondylosis, herniated discs, frequent Strep B infection, post traumatic headaches, lymphadenitis and cellulitis. Her medications were listed as Ultram, Lisinopril, Flexirill, Vicodin, Amoxicillin, Ketoconazole, Temazepam, Lasix, Grisefulvin, Cardizem, Lexapro, Xanax, Triamcindolon, Bactrim, Toprol, Doxycycline, Clindamycin and Robaxin. [Tr. 42–423, 427-433].

The Plaintiff was also admitted on July 25, 2007, for a follicular cyst on her right ovary. A transabdominal and transvaginal somographic evaluation of the pelvis was done. IMPRESSION: [1]. Small to moderate amount of free fluid noted. 2. Otherwise unremarkable examination."[454-455].

On October 24, 2007, the Plaintiff underwent an examination by William Gelinas, D.O. for varicose veins. A venous duplex exam was performed on both lower extremities. IMPRESSION: [I]ncompetent bilateral greater saphenous veins. [Tr. 439-440]. On October 31, 2007, Dr. Gelinas advised Dr. Tawfik by letter that he would be performing radio frequency ablation of both the greater saphenous veins in the thigh or stripping them due to venous insufficiency of the right leg.. [Tr. 435]. On January 25, 2008, he performed the saphenous vein stripping procedure from the groin to above the knee on the right leg. The Plaintiff followed up with Dr. Gelinas on January 30, 2008. It was recommended that the Plaintiff return to get the staples removed; to leave on the ACE bandage and wear support hose below the knee. [Tr. 482].

On March 23, 2004, Caroline L. Moore, D.O., completed a physical Residual Functional Capacity Assessment finding that the Plaintiff could perform unlimited light work activity. Dr. Moore also found the Plaintiff's symptoms to be attributable to a medically determinable impairment and that the severity of the symptoms is consistent with the total medical and non medical evidence. [Tr. 340]. On May 21, 2004, A.E. Archibald-Long, M.D., P.C. completed a Physical Residual Functional Capacity Assessment finding that the Plaintiff could perform unlimited light work activity. Dr. Archibald-Long opined: "[I]t is projected that this claimant should regain capability of performing WRLW within a year of her most recent trauma. [Tr. 349].

**B.    SPECIFIC ISSUES:**

**1.    THE ALJ COMMITTED REVERSIBLE ERROR BY FAILING TO SET FORTH THE REQUISITE GOOD CAUSE FOR REJECTING THE OPINION OF DR. THOMAS, THE PLAINTIFF'S TREATING PHYSICIAN**

Dr. Thomas was the Plaintiff's treating physician from August of 2003 through February 2006. Dr. Thomas completed a detailed physical medical assessment questionnaire on December 6, 2007, stating she had last seen the Plaintiff on November 15, 2007. [Tr. 353-358, 374-379, 380, 399]. In that questionnaire, Dr. Thomas opined that the Plaintiff's impairments had lasted for at least twelve months, that she is not a malingerer, that her impairments are consistent with her symptoms and functional limitations and that her pain will often interfere with her attention and concentration and that "increased stress can exacerbate symptoms." [Tr. 375]. Concerning the Plaintiff's functional limitations, Dr. Thomas found the Plaintiff could not walk more than two or three blocks without rest or due to the severe pain; sit for more than 30 minutes at a time; stand

more than 20 minutes at one time; and would have the need to lie down after prolonged standing/ sitting, could lift less than 10 lbs. frequently and 10 lbs. occasionally, but never 20 lbs. or more. [Tr. 375-377].   The doctor found the Plaintiff has limitations in repetitive reaching, handling and can  reach less than 10% in an 8-hour workday because of dizziness. [Tr. 277-278].

The ALJ assigned "little weight" to Dr. Thomas finding noting:

"[T]here is no indication in the record that Dr. Thomas is familiar with the evidentiary requirements of Social Security disability programs.  Finally, any conclusions regarding the ultimate issue of disability are reserved to the Commissioner and are not binding on the undersigned.  (20 C.F.R. §404.1527).  I find that neither the objective medical evidence in the record nor the claimant's own testimony is consistent with extreme functional limitations ..., [Tr. 30-31].

"[T]he testimony of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2003), *citing Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).  The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error.

Dr. Thomas' opinion is not an issue reserved to the Commissioner as the ALJ found.  The regulations define an issue which is reserved to the Commissioner as an opinion that a claimant is 'disabled' or 'unable to work'.  20 C.F.R. §404.1527(e)(1).  The regulations certainly rely on the treating sources to provide opinions on the issues of the Plaintiff's impairments and whether they meet or equal a listed impairment or their residual functional capacity.  Additionally, objective medical evidence of record support Dr. Thomas's findings.  The MRI's of the Plaintiff's lumbar spine (as noted previously) documenting herniated disks at multiple levels confirm  his findings of

the Plaintiff's back impairment and its severity.  Dr. Volbracht, also opined that the Plaintiff was

not able to perform sustained work activities and that her limitations would not allow for the

performance of a full range of sedentary work. [Tr. 333].  The ALJ's assessment is not supported

by the medical evidence of record.   The ALJ failed to provide specific substantiated reasons for

discrediting the treating provider's opinion.

**2.     THE ALJ'S CREDIBILITY FINDING IS NOT BASED ON SUBSTANTIAL EVIDENCE**

The Plaintiff contends the ALJ failed to apply the proper standard for the evaluation of pain

and credibility and that the ALJ's RFC determination is contrary to the medical evidence of record.

The Eleventh Circuit pain standard requires (1) evidence of an underlying medical condition

and either (2) objective evidence that confirms the severity of the alleged pain arising from that

condition, or (3) that the objectively determined medical condition is of such severity that it can

reasonably be expected to give rise to the alleged pain.  Once the standard is met, the ALJ must still

evaluate the intensity and persistence of the symptoms based on all of the evidence of record.  20

C.F.R. 404.1529©). The ALJ may discredit a claimant's subjective testimony regarding pain if he

articulates explicit and adequate reasons for doing so.  *Wilson v. Barnhart*, 284 F.3d 1219, 1221

(11th Cir. 2002).  Determining the credibility of a claimant is the duty of the Commissioner.  *Foote*

*v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995).  "A clearly articulated credibility finding with

substantial supporting evidence in the record will not be disturbed by a reviewing court."  *Id*.

The medical evidence of record shows the Plaintiff  being treated with considerable

amounts of medications for her pain.  The record also shows that the Plaintiff had repeated

complaints of medication side effects, to-wit: drowsiness, dizziness, nausea and nightmares.  The

treating physicians have not found that the Plaintiff can perform work duties at even the sedentary work level. While the ALJ acknowledged that the Plaintiff's use of Flexeril and Demerol "make her feel extremely tired", she failed to provide any reasons for rejecting this evidence.

However, the ALJ did rely on and cite to evidence provided in a letter from the Plaintiff's disability insurance carrier. The Plaintiff was notified by letter from her insurance company that she was no longer eligible for long-term disability benefits. On July 25, 2007, the Plaintiff had been observed during an "activities check" driving to the grocery store and back to her residence and that "[s]he carried groceries into her home, bended at the waist and opened/closed her vehicle door." The Plaintiff was observed again on July 26, 2007, driving her vehicle to the functional capacity evaluation then back home again. "[Y]ou were seen walking, standing, bending at the waist, entering and exiting your vehicle and driving. These observed activities were all performed in a smooth, fluid manner without any external signs of impairment or physical restriction." [Tr. 81]. Thus, the insurance company considered the Plaintiff's functional capacity evaluation, peer record review, activities check, conversation with Dr. Thomas, Transferable Skills Analysis and determined the Plaintiff was capable of sedentary work. [Tr. 81].

This information from the disability insurance carrier is information that someone else observed. This is not reliable evidence upon which to base a credibility finding. An investigator observed the Plaintiff coming home after grocery shopping and getting out of her car. [Tr. 31, 81]. The report does not state how many groceries the Plaintiff lifted or how many times she returned to her car to get the groceries. The Plaintiff never claimed that she was unable to go grocery shopping only that she is normally assisted with the shopping and cannot lift the heavier items. [Tr. 153, 158,

518].  This report does not contradict any statements that the Plaintiff testified to at the hearing. *Lewis v. Callahan,* 25 F.3d 1346, 1441 (11th Cir. 1997).  *Bennett v. Barnhart*, 288 F. Supp.2d, 1252 (N.D. Ala. 2003).

The ALJ, in making his credibility finding, focused on the evidence that pre-dated the Plaintiff's second automobile accident, at which time her condition worsened.  While the Plaintiff may have received medical clearance to return to work in 2003, this was prior to the MVA in March of 2004.  Dr. Vollbrach did express the opinion in 2003 that the Plaintiff could perform light duty work, but he changed his opinion after the Plaintiff's second MVA. [Tr. 332, 333]

Thus, the ALJ determined that: "[s]he had achieved some measure of recovery from her injuries;" that the functional capacity assessment indicated she could perform at least sedentary work and reflected that the Plaintiff had not put forth consistent effort; the letter from the disability insurance carrier noted specific physical observations that "suggest that the claimant has overstated the extent of her functional limitations;" and the assessments by  Dr. Thomas and Dr. Vollbracht appear to be based heavily on claimant's subjective complaints and are unsupported by the medical evidence.   Dr. Vollbracht expressed the opinion that the Plaintiff could perform light duty work; and that the State agency assessments are consistent with the medical evidence of record. [Tr. 30-31].  These findings are not supported by substantial evidence.

**3.       THE ALJ FAILED TO SUSTAIN HIS BURDEN OF PROOF ESTABLISHING THAT THERE IS OTHER WORK IN THE NATIONAL ECONOMY THAT THE PLAINTIFF CAN PERFORM**

The ALJ determined the Plaintiff could not return to her past relevant work as a nurse's helper. [Tr. 31].  The ALJ relied on the vocational expert's response to a hypothetical question in finding the Plaintiff can work as a packer, inspector, cashier, assembler, inspector, and parking lot

attendant or self-service gas station cashier. [Tr. 32]. The ALJ failed to include that the Plaintiff

needs to alternate between sitting and standing, and failed to include all the functional limitations

of the Plaintiff which are supported by the record.

The vocational expert found the Plaintiff's position as a nursing assistant to be heavy, semi-

skilled work. [Tr. 523]. The ALJ gave the Plaintiff's background as someone who could

"[o]ccasionally lift 20 pounds, frequently 10; stand or walk six hours; sit six hours; push and/or

pull is unlimited, no postural limitations, no manipulative limitations and no visual, environmental

or communicative limitations." [Tr. 524, 525]. The VE replied that the person could not perform

her past relevant work.

The ALJ then asked the VE to consider the same lifting elements "but with the caveat that

she has to (INAUDIBLE); and that she can only occasionally for (sic) her postural limitations, on

an occasional basis, including bending." [Tr. 525]. The VE again stated the person would not be

able to perform her prior job but could work as a packer, inspector or cashier. The ALJ asked the

VE to assume that if the person could perform less than the full range of sedentary work, in jobs

that would allow for alternating positions and occasional postural activity, again the VE identified

jobs as bench assembly, inspector; and cashier. [Tr. 536].

The ALJ failed to comprehensively describe the Plaintiff's full limitations. There was no

mention that the Plaintiff requires a sit/stand option (at her option), and that there can only be

occasional bending, stooping, crawling, climbing, crouching or balancing." [Tr. 27]. He also failed

to include any reaching limitations or the limitations found by Dr. Thomas, as already discussed.

While the ALJ did include the need to alternate positions, he failed to state that the change of

position would be "at her option" or "at will." [Tr. 536]. Social Security Ruling 83-12, "[u]nskilled

types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will." SSR 83-12, 1983 WL 31253 (S.S.A. 19983).

The VE conceded that there were no jobs that the Plaintiff could perform is she would need to rest daily (in the morning and afternoon); would need to elevate her legs; and could only lift or walk less than a half hour in any activity, "[a]lthough she says she can lift a (INAUDIBLE), but not frequently." [Tr. 526, 527]. The VE reasons that such a description "does not rise to the level of either full-time work; on one hand, or would be considered to be less than sedentary." [Tr. 527]. Therefore, the VE's testimony supports a finding that there is no work in the national economy that the Plaintiff can perform.

Further, the VE failed to provide any DOT numbers for the jobs he identified.. Social Security Ruling 00-4p sets out the ALJ's duty to both "ask about any possible conflict between that (vocational expert or vocational specialist) evidence and information provided in the DOT: and if the vocational evidence conflicts with the DOT "a reasonable explanation is to be obtained. In the instant case, the ALJ failed to ask the VE whether his testimony was consistent with the DOT as required. *Estrada v. Barnhart*, 417 F. Supp. 2d 1299, 1303-04 (M.D. Fla. 2006).

The VE's testimony that the jobs of bench assembler and cashier are sedentary jobs is not consistent with the DOT, which defines both as entailing light exertion. Additionally, the VE's testimony that an individual who must allow for alternating positions can, in fact, perform either light or sedentary jobs conflicts with the DOT. A light job entails standing for up to six hours a day in "an upright position without moving about" and would not allow for a sit/stand option. A sedentary job entails sitting for up to six hours out of an 8 hour workday, and the DOT specifies that "sitting" is defined as "[r]emaining in a seated position," which would also not allow for a

-17-

sit/stand option.

### III. CONCLUSION

There is a reasonable possibility that a proper analysis of the Plaintiff's exertional and non

exertional impairments would change the administrative results. It is hereby **ORDERED** that the

decision of the Commissioner be **REVERSED** and **REMANDED** pursuant to 42 U.S.C. § 405 (g)

to allow the Administrative Judge to:

(1)     reassess the opinion of Dr. Thomas,

(2)     reassess the Plaintiff's subjective complaints and credibility;

(3)     obtain new vocational expert testimony regarding whether there is other work in the

national economy the Plaintiff can perform based on a complete and accurate hypothetical question

to the VE and resolving all conflicts as required by SSR 00-4p; and

(4)     issue a new decision based on substantial evidence and proper legal standards.

(5)     the Office of the Clerk is directed to enter judgment consistent with this opinion

and, thereafter, to close the file.

**DONE and ENTERED** in Chambers at Fort Myers, Florida, this  day of  14th day of July

2009.

DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to:
All Counsel of Record